UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                    CRIMINAL NO. 3:16-CR-40-DPJ-FKB

KHALIL SLAYTON, JEROME
BENAMON, AND EDWARD JAMES
MOBLEY

ORDER

Defendants Jerome Benamon and Edward James Mobley have asked for a new trial under

Federal Rule of Criminal Procedure 33.  For the reasons that follow, their motions are denied.

I.      Facts and Procedural History

On May 17, 2016, Benamon and Mobley, along with Khalil Slayton, were charged in the

armed robbery of Marvin Davis, a United States Postal Service Highway Contract Route Driver.

*See* Indictment [1] (charging Defendants with violations of 18 U.S.C. §§ 924(c), 1708, and

2114).  Slayton pled guilty and testified against Benamon and Mobley at trial.

According to Slayton's testimony, he, Mobley, and Benamon decided to rob Davis on

April 4, 2016, after Benamon learned from his mother, postal-service employee Essie Benamon,

that the mail truck would contain bags of cash that day.  Slayton says that at around 4:30 p.m.,

Benamon dropped him and Mobley in Porterville, Mississippi, where they waited for Davis's

scheduled arrival at the post office.  Porterville, Mississippi, is a small rural community with

little more than the post office and a few homes.

After the drop off, Benamon was to wait just north of town on Porterville Road and then

return when Slayton and Mobley had the money.  But Slayton said things quickly deviated from

the script when Mobley unexpectedly pointed a 9-millimeter firearm at Davis and Davis charged

Mobley to secure the gun.  The gun discharged during the struggle, but no one was hit.  When Slayton heard the shot from inside the postal truck's cargo area, he panicked.  Instead of waiting for Benamon's return, he ran across nearby railroad tracks and into the woods with the money.

The trial lasted eight days, and the jury convicted Benamon and Mobley on Counts 1 and 2 of the Indictment.  In their motions for a new trial, Defendants say the Government violated their due-process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce exculpatory surveillance tapes.  They also contend that the prosecutor engaged in misconduct during closing argument.  Following initial briefing, the Court ordered supplemental briefing.  Order [165].  It then held a February 27, 2019 evidentiary hearing and requested final briefing based on new arguments Defendants asserted that day.  Order [179].  The Court is now prepared to rule.

II.     Standard

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  But "[t]he grant of a new trial is necessarily an extreme measure."  *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).  Therefore, "motions for new trial are not favored, and are granted only with great caution."  *Id.* (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)).  "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."  *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *O'Keefe*, 128 F.3d at 898).  An error affects the defendant's substantial rights if "it affected the outcome of the trial court proceedings."  *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001).

When considering a motion for a new trial, the Court "may weigh the evidence and assess the credibility of the witnesses."  *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005)

(citing *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* (quoting *Robertson*, 110 F.3d at 1118). And "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright, et al., Federal Practice and Procedure § 556 (3d ed. 2004)).

III.    Analysis

      A.    *Brady* and the Surveillance Video

At trial, Porterville resident Steve Blaylock testified regarding video captured on his home surveillance system. Blaylock lived on Porterville Road approximately 2 to 3 miles north of the Porterville post office where the crime occurred and roughly one-quarter mile south of the Highway 45 and Porterville Road intersection. According to Blaylock, someone ran over his dog that evening, so he checked his newly installed surveillance camera to see who it was. At approximately 5:43 p.m. on the tape, he saw what he believed to be a maroon Toyota Camry with tinted windows and chrome rims pass his house heading south toward the post office, hit his dog, and fail to stop. There is no dispute Benamon drove a maroon Toyota Camry with tinted windows and custom rims.

Within 24 hours of the hit and run, Blaylock sent a screenshot of the vehicle to a sheriff's deputy. A short time later, law-enforcement officers reviewed Blaylock's video footage, and the Government eventually produced two short video clips from it to Defendants. The clips showed the maroon sedan twice passing Blaylock's house as it drove south toward Porterville—once at approximately 2:39 p.m. and then at approximately 5:43 p.m. when it hit the dog.

Defendants say the absence of any video showing the sedan passing Blaylock's home around 4:30 p.m. contradicts Slayton's trial testimony that Benamon drove south on Porterville Road around that time to drop Slayton and Mobley off near the post office. *See* Slayton Tr. [169-1] at 174–75. But their legal arguments regarding the tape have evolved over time.

Defendants initially argued that the Government possessed but failed to produce the remaining video, thereby violating their *Brady* rights. *See* Mot. [160] at 1. They based that argument on Blaylock's trial testimony that he "gave the [G]overnment three days' worth of videos." Blaylock Tr. [163] at 33. But the Government responded to the initial *Brady* argument with declarations from Blaylock and lead United States Postal Inspector Dominick Riley, stating that the Government never obtained three days' worth of video from Blaylock's system. *See* Riley Decl. [164-1]; Blaylock Decl. [164-3]. Blaylock's hearing testimony then confirmed that he gave the Government access to his surveillance system but that he did not mean to suggest the Government took three days' worth of video. Accordingly, Defendants' initial argument is not factually supported.

Faced with this post-trial evidence, Benamon pivoted his argument, claiming the Government failed to preserve additional footage from Blaylock's camera before the system automatically recorded over it—something that was set to occur every 30 days. Benamon says this failure violated his due-process rights.

"The Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material to either guilt or to punishment." *California v. Trombetta*, 467 U.S. 479, 480 (1984). "Evidence is material under *Brady* when there is a 'reasonable probability' that the outcome of the trial would have been different if the

evidence had been disclosed to the defendant." *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In *Trombetta*, the Supreme Court considered "whether the Fourteenth Amendment also demands that the State preserve potentially exculpatory evidence on behalf of defendants." 467 U.S. at 481. The Court held that the Constitution imposes a duty on the government to preserve evidence only if that evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

The Supreme Court added to the analysis in *Arizona v. Youngblood*, when it considered the government's failure to preserve evidence that was only "potentially useful." 488 U.S. 51, 58 (1988). The Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* So under these decisions, "[f]ailure to preserve *material exculpatory* evidence violates due process rights irrespective of whether the government acted in good faith or bad faith. However, failure to preserve *merely potentially useful* evidence does not constitute a denial of due process absent a showing of bad faith." *United States v. McNealy*, 625 F.3d 858, 868 (5th Cir. 2010) (emphasis added).

When the officers obtained the two clips, the remaining video evidence from that afternoon was potentially useful but not materially exculpatory. The only way the evidence would be truly exculpatory is *if* it showed no traffic on Porterville Road just before the robbery *and* the perpetrator had no other route to the scene. But as seen in the following diagram, Porterville can be accessed by car from the east or west on Highway 498, and from the north by

either taking Porterville Road or Highway 45 south and then Highway 498 east.  Or, one could

arrive on foot by walking from Highway 45 through a wooded area to the community.[1]



So even if the video shows no traffic on Porterville Road just before the robbery, a suspect could

have accessed and then left Porterville other ways.  The missing video was never exculpatory;

and there is certainly nothing suggesting the officers should have considered it exculpatory

before it was recorded over.

At most, the absence of Benamon's vehicle on the video around 4:30 p.m. would have

contradicted Slayton's timeline testimony, which is not itself exculpatory.  But even that value

was unknown when the officers obtained the clips.  By all accounts, the Government visited

Blaylock two or three days after the April 4, 2016 robbery, yet Slayton was not arrested until

June 8, 2016.  So at the earliest, the Government would not have known about the alleged

impeachment value until one month after the video was automatically recorded over.

---

[1] This diagram is not in evidence, but it depicts the roads seen on the satellite map the
Government introduced as G-2.2.

Because the tapes were potentially useful but not materially exculpatory, under *Youngblood*, Defendants must show the Government acted in bad faith by failing to preserve additional footage from Blaylock's video surveillance system. A similar argument was asserted in *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006). There, the government recorded the defendant's telephone conversations while he was incarcerated on another charge, but it retained only the conversations that were incriminating. *Id.* The defendant argued that the government should have kept all recorded conversations and acted in bad faith by allowing the other tapes to be recycled per BOP policy. The Fifth Circuit rejected the argument, holding:

> Moore also fails to successfully traverse the second avenue for demonstrating a *Brady* violation. With respect to potentially useful evidence, the lost tapes parallel the cocaine in *Youngblood*, which was destroyed pursuant to standard procedure and, thus, did not constitute a constitutional violation. Similarly, the BOP recycled all of the tapes after 180 days, as per the BOP's policy. As such, the BOP did not destroy the tapes in bad faith. Moore's argument that bad faith can be inferred from the fact that only excerpts containing inculpatory evidence survived and that retaining all of the tapes would not have been unduly burdensome altogether fails to prove bad faith.

*Id.* at 388–89.

As in *Moore*, Defendants fault the Government for preserving only portions of the video, speculating that the rest would help them. But bad faith is even less apparent here. In *Moore*, the government's own policies allowed the evidence to be destroyed. Here, the evidence was lost due to Blaylock's retention settings. Finally, as noted above, Defendants have not shown that before the tapes were recycled the agents had reason to know that a video showing no traffic on Porterville Road was noteworthy, much less exculpatory. Absent a showing of bad faith, the failure to preserve additional video evidence that would have been potentially useful to the defense does not amount to a constitutional violation. *See Youngblood*, 488 U.S. at 58.

But the analysis does not end there because Mobley's post-trial counsel raised another argument at the February 27 evidentiary hearing. Mobley contends that under *Brady*, the

Government was required to disclose that the unpreserved video footage would have contradicted Slayton's testimony once his testimony was known.

Based on the post-trial hearing testimony, it seems apparent that one of the officers who visited Blaylock's home to see the video footage must have viewed the contents of the robbery-day video between 2:39 p.m. to 5:43 p.m. Blaylock merely looked at the time when the car hit his dog, so someone else reviewed what happened earlier. And that officer chose to keep the two clips of the maroon sedan passing Blaylock's home. Either the remaining video showed no additional traffic, or the officer missed Benamon's vehicle heading south around 4:30 p.m. (as Slayton testified). Either way, it seems reasonable that the officer who reviewed the video thought there were no other instances where the suspected get-away car passed Blaylock's home.[2]

---

[2] This is a factual finding based on an unclear record of events that occurred nearly three years before the February 27, 2019 hearing. Four witnesses testified. United States Postal Inspector Dominck Riley testified that he downloaded the two clips from Blaylock's system onto a flash drive. He says that when he went to Blaylock's home to obtain the video, Blaylock "had the video that was cued up." Tr. [184] at 5. So Riley merely "put [his] thumb drive in and recorded that—those clips, which is what we turned over." *Id.* at 8. Riley said Blaylock had the video "saved . . . in a separate file" that he was able to copy; he denied "look[ing] at the tape to see what else was on there." *Id.* at 13, 10. Robert Joyner and Jeffrey Jowers, investigators with the Kemper County Sheriff's Department, went to Blaylock's home before Riley and attempted to retrieve footage from the surveillance system. Joyner testified that they viewed "a few minutes before[ and] a few minutes after" the point at which "the car went through at the . . . 5:42 mark." *Id.* at 28. Jowers agreed that he and Joyner viewed video footage from "[a] couple of minutes before the dog got hit" but stated he did not recall watching any video from earlier in the day. *Id.* at 48. All of this testimony left the impression that none of the officers viewed the video far enough back to have identified Benamon's car at 2:39 p.m., indicating that Blaylock himself must have done so and saved the two clips as a separate file or files that Riley was able to download.

But Blaylock's testimony conflicts with that impression. He testified that when Joyner and Jowers initially visited his home, he simply cued up the video to the place at which the car hit the dog "and let them look at it, and they went from there." *Id.* at 73. He credibly testified that he did not copy or save any clips because he does not "know how to work all that like that." *Id.* at 77; *see also id.* at 77–78 ("I don't know to do nothing but maybe just get in it and look at it, and

So the question is whether the Government should have told Defendants that they believed the video showed no other traffic once it knew Slayton's account. "To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016).

As discussed, no one knows what the missing video might show, but if the jury heard that the officers thought they produced the only video of Benamon on Porterville Road, it would impeach Slayton's timeline testimony. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (explaining that *Brady* requires "the evidence at issue [to] be favorable to the accused, *either because it is exculpatory, or because it is impeaching*" (emphasis added)). And because the state and federal officers worked together, that knowledge would be imputed to the prosecutors. *See Avila v. Quarterman*, 560 F.3d 299, 307–08 (5th Cir. 2009). While it is not clear which officers reviewed the full video or what they saw, assuming the evidence was suppressed after Slayton gave his account, Defendants still fail to show materiality.

---

that's it. I don't even know how to do any of that."). In fact, he testified that he does not know whether the system would have allowed him to save a video clip as a separate file. *Id.* at 92. He did not cue up or copy anything for Riley's subsequent visit. *Id.* at 79, 81. Blaylock also explained that to find the spot in the video where the car hit his dog, he would have manually rewound the footage. *Id.* at 91.

So the evidence at the hearing tells an incomplete and conflicted story about who found the 2:39 p.m. clip of the maroon Camry. But, according to Blaylock's explanation of how the system worked, someone would have had to view the footage from that day in reverse, using the system's rewind function, to find and obtain that earlier clip. In doing so, that person would have seen every vehicle that drove past Blaylock's home between 2:39 p.m. and 5:43 p.m.

Materiality "is generally the most difficult [*Brady* element] to prove." *Mahler v. Kaylo*,

537 F.3d 494, 500 (5th Cir. 2008).

> Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury. To prevail on [a] *Brady* claim, [the defendant] need not show that he more likely than not would have been acquitted had the new evidence been admitted. He must show only that the new evidence is sufficient to undermine confidence in the verdict.

*Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quotation marks and citations omitted). The

Court must "review[] all trial evidence . . . to determine whether there is a reasonable probability

that, had the [suppressed evidence] been disclosed to the defense, the result of the proceeding

would have been different." *Banks v. Thaler*, 583 F.3d 295, 314 (5th Cir. 2009) (quotation

marks and citation omitted).

The Court starts with Slayton. Assuming the investigating officers thought they had

produced the only evidence of Benamon passing Blaylock's home, that would impeach Slayton's

testimony that they drove south on Porterville Road around 4:30 p.m. for the drop off. It would

also impeach his testimony that Benamon drove back up the road after leaving Slayton and

Mobley. But as the Government notes, Slayton was led into those statements on cross-

examination and never seemed sure. For example, he also seemed to suggest on direct that

Benamon planned to use Highway 45 north to go around the town after the drop off. *See* Slayton

Tr. [169-1] at 126–27. And Slayton frequently couched his answers by noting that he was not

from Porterville and did not "know [his] way around the area at all." Slayton Tr. [169-1] at 29;

*see also id.* at 127 (stating on cross examination about the route Benamon was to take, "I'm not

real familiar with the area"); *id*. at 128 (stating, "I don't know this area"). This diminishes the

impeachment value.[3]

---

[3] Alternatively, the video might mean Slayton's timeline is off and they actually passed at 2:39 p.m.

Also, the missing video did not prevent Defendants from impeaching Slayton with it—they did. There was no dispute that law-enforcement had access to Blaylock's video, yet the only clips produced were those showing a vehicle passing at 2:39 p.m. and 5:43 p.m. The issue was not lost on defense counsel. First, Mobley's attorney cross examined Slayton on this specific point:

> Q.    So if there were cameras on that road, y'all would have been captured before the [postal] truck got there [i.e., while being dropped off around 4:30 p.m.] Correct?
>
> A.    I guess so.
>
> Q.    Okay. And if law enforcement had three days of video, they would have seen y'all. Correct?
>
> A.    I guess so.

*Id.* at 174–75. Benamon's counsel then used that issue as his final point in summation, arguing that the Government's failure to produce video consistent with Slayton's testimony proved no such evidence existed. Tr. [167-1] at 59–61.

At best, Defendants missed the chance to offer testimony from an officer stating that the Government produced the only known video of the car. But Defendants obviously recognized this issue before trial—they made a document request for the remaining tape—and nothing prevented them from developing the needed testimony in the courtroom. Regardless, they squarely placed the issue before the jury, and it was not exculpatory anyway due to the various access points to Portersville.

And this impeachment evidence was not Defendants' only ammunition against Slayton's credibility. In particular, they elicited testimony that Slayton was a five-time convicted felon with an antisocial personality disorder. They also called an expert who testified—over objection—that individuals with this disorder (1) act out of self-interest and with reckless

11

disregard to others; (2) are manipulativeness; (3) have an impaired ability to comprehend and tell the truth; and (4) lack remorse. Finally, Defendants' cross-examination of Slayton consumes 112 pages of the transcript. During that examination, counsel for Benamon and Mobley both drilled Slayton on every perceived inconsistency in his story. So testimony from a witness casting doubt on Slayton's cross-examination account of the route they took—a non-exculpatory point regarding a subject about which he was admittedly not very familiar—"would not have significantly added to the impeachment ammunition that [Defendants] already had." *Cobb v. Thaler*, 682 F.3d 364, 380 (5th Cir. 2012).

Even if Slayton's credibility would have been damaged further by evidence that the officers produced the only existing images, the evidence of Defendants' guilt was still such that the suppression does not undermine confidence in the verdict because other evidence corroborated his account. For example, Davis testified that the suspects must have known what they were looking for in his postal truck, and Slayton confirmed that suspicion. He knew when the mail truck would be in Porterville; that the truck would be carrying cash; which bags contained cash instead of mail; and where on the truck he would find them. Slayton says he gained that inside information from Benamon, who learned it from his mother, postal-service employee Essie Benamon. Significantly, Essie knew the money would be in Davis's truck that day because she signed a voucher for it at one of Davis's earlier stops. Her co-worker, Lakevia Washington-Smith, offered further corroboration, testifying that Essie was acting strange that day about the money.

The cell-phone data was also incriminating. Defendants correctly argued that such data does not provide pinpoint positions, but it did show that Slayton's cell phone was in Benamon's car before, during, and after the robbery. Significantly, it also showed that at 5:06 p.m.,

Benamon's phone was within 400 meters of a location three miles north of the Porterville post office on the Porterville Road. Although that location is farther north than Slayton *thought* Benamon was supposed to wait, Slayton testified that he could not see the vehicle after the drop off, and the data is consistent with his testimony that Benamon was waiting north of town on that same road at that time.

Six minutes after the 5:06 p.m. ping north of town, witness Lawanda Grantham says she heard the gunshot. And one minute later, at 5:13 p.m., Mobley called Benamon's cell phone. That call ended at 5:34 p.m., which is about when the police arrived. Nine minutes after that, Blaylock's video shows a car matching the description of Benamon's Camry traveling toward Porterville, hitting his dog, and failing to stop. The 5:06 p.m. ping offers additional significance as it relates to that video. The ping location was roughly one mile north of Blaylock's home, yet it was another 37 minutes before Benamon drove by. This too supports Slayton's testimony that Benamon was waiting in the get-away car.

On top of this evidence, Benamon's actions after the robbery suggest a consciousness of guilt. Benamon spoke with authorities on April 5 and 13, giving a hand-written statement during the second meeting. That statement gave a step-by-step account of his whereabouts that day. Notably, Benamon wrote that he was in Scooba, Mississippi, for a few hours until his mother called to tell him about the robbery. Trial Ex. G-29. But if Benamon did not leave Scooba until after the 5:12 p.m. robbery was over, then how did his phone ping a tower just north of Porterville at 5:06 p.m.? According to Davis, Scooba is eleven miles north of Porterville. Thus, the data contradicts Benamon's carefully drafted written statement to the authorities regarding his whereabouts just before the robbery.

In that same written statement, Benamon claimed that after his mother called, he left Scooba and drove to the Porterville post office to see "what all the fuss was about." *Id.* But because he had marijuana in the car, Benamon drove away when he saw the heavy law-enforcement presence. *Id.* According to his statements, he went home to shower and then went to Meridian, Mississippi, to meet his mother. *Id.*

For starters, why would Benamon drive to the crime scene at all, especially with drugs in his vehicle? And even assuming curiosity got the best of him, why would he be in such a hurry to arrive? Blaylock testified that the car was traveling faster than expected for a vehicle with chrome rims on a dirt road and then failed to stop after hitting his dog.

As for the claim that he left town to see his mother in Meridian, Benamon actually met with his sister in Meridian, and there may be a good reason why he would not want the officers to know that. According to his sister's testimony, Benamon told her he needed to get rid of Slayton's cell phone and told her to lie to authorities if asked about it. This suggests he knew Slayton was involved within hours of the robbery and long before Slayton was a suspect.

Equally suspicious is the route Benamon traveled to Meridian. Phone records and photographs show that Benamon traveled east through Alabama and then looped back west to Meridian, a fact he failed to mention in his hand-written, turn-by-turn account of his travels that day. *See* Tr. Ex. G-29. Choosing that circuitous route nearly doubled Benamon's drive time because Highway 45 is basically a straight shot southwest to Meridian.

As the investigation continued, more evidence was found. For example, officers seized a somewhat distinctive firearm from Benamon that both the victim and Slayton identified as the weapon used in the crime. Authorities also obtained Benamon's cell phone. That search revealed that he had deleted three of the twenty-four text messages he sent or received on April

5—the day after the robbery. All three were incriminating. First, he sent a text at 10:15 a.m. stating, "We found it." Second, he received a text at 3:00 p.m. from someone stating, "If yall found it." Third, Benamon deleted a text he sent to Slayton at 6:42 p.m. stating, "Where da f*** you getting all this money from." The evidence showed that this text came in response to Slayton's social-media post showing him in an expensive hotel room. Again, the decision to delete just these three text messages suggests that Benamon knew they were incriminating and was trying to distance himself from Slayton the day after the robbery—before Slayton was a suspect.

While the case against Mobley was more circumstantial, it too was strong. Slayton identified Mobley as the gunman, and Mobley was witnessed riding in a car driving away from the scene soon after the robbery, though that testimony was conflicting. More significantly, Mobley opened a phone call with Benamon one minute after Grantham heard the gunshot. The call ended almost the moment police officers arrived at the scene of the robbery. The timing of the call provides strong circumstantial evidence that Mobley participated in the robbery and corroborates Slayton's testimony that Mobley was involved.

There was evidence Defendants highlighted to suggest reasonable doubt. But the evidence of guilt was strong, and the jury heard the argument that the missing video would have contradicted Slayton's testimony about the routes they took before the robbery. On this record, the alleged *Brady* violation fails to "undermine confidence in the verdict." *Wearry*, 136 S. Ct. at 1006. Defendants' *Brady* claim does not require a new trial.

B.    Statements in Closing Argument

Defendants also take issue with three statements the prosecutor made during closing arguments regarding: (1) the Blaylock clips; (2) Deborah Simon's testimony about the time she

15

saw Defendants drive past her house; and (3) whether Defendants had offered proof supporting their closing-argument statements.

Benamon correctly notes that "[i]t is improper for counsel to express his personal opinion or to state facts of his own knowledge, not in evidence, and not part of the evidence to be presented; or to make unwarranted inferences or insinuations calculated to prejudice the defendant." *Dunn v. United States*, 307 F.2d 883, 885–86 (5th Cir. 1962). "The prohibition on giving personal opinions prevents a prosecutor from giving the jury the impression that he has superior knowledge of the facts based on private information not admitted into evidence." *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012). But "[o]verturning a jury verdict for prosecutorial misconduct is appropriate only when, 'taken as a whole in the context of the entire case,' the prosecutor's comments 'prejudicially affect[ed the] substantial rights of the defendant.'" *Id.* at 337 (quoting *United States v. Risi*, 603 F.2d 1193, 1196 (5th Cir. 1979)); *see also United States v. Valas*, 822 F.3d 228, 243 (5th Cir. 2016) ("'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone,' and '[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989))).

"In determining whether the defendant's substantial rights were affected, we consider three factors: '(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction.'" *Delgado*, 672 F.3d at 337 (quoting *United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999)). With this legal framework in mind, the Court will address the three disputed statements individually, focusing initially on the magnitude and cautionary-instruction

elements.  The strength-of-the-evidence element will be considered at the end as to all disputed statements.

        1.      Three Days' Worth of Video

Defendants first say the Government mischaracterized Steve Blaylock's testimony about whether the Government obtained three days' worth of video from him and compounded the problem by stating facts not in evidence.

During his direct examination at trial, Blaylock testified that officers wanted to "rip some stuff off of" the tapes.  Tr. [163] at 16.  But he later agreed when Benamon's counsel asked, "All right.  Now, also, it's my understanding from our previous conversations that the—you gave the government three days' worth of videos."  *Id.* at 33.  These statements were not entirely clear, but we now know from his hearing testimony what Blaylock meant—he gave the Government access to those three days so it could "rip," or copy, what it needed.

Both parties addressed this testimony at trial during their closing arguments, offering their spin on what Blaylock said.  So to put the Government's now-disputed rebuttal argument in context, the Court will begin with the defense arguments to which the rebuttal was offered. During Benamon's closing, his attorney stated:

> Blaylock said there was a video.  He gave them three days worth of video. Remember this.  They are going to talk about cars doing this and that.  If there's a video—if the getaway car went north on Porterville Road, *they've got the video*. *The government's got a video of it*.  All this activity they are saying that should have taken place on Porterville Road, the government was given a video.  The only video of Benamon's car was at 5:43 going south.  There's no video of his car going north afterwards.  And if he was there parked, it would have gone that way.
>
> . . . .
>
> And if Slayton's story is true, if he's telling the truth, Blaylock's video would show it.  And if Blaylock's video showed the evidence the way the government's going to get up here and tell you they were doing all these things and they were moving up and down that road, don't you think we would have seen it?  We

would have had evidence of that from them here, and there's been no evidence of that.

. . . .

. . . But you've got video, a video—*the government has three days worth of video*, and it is beyond a reasonable doubt that Slayton's story is true if the video evidence does not support it?

Tr. [167-1] at 59–61 (emphasis added).

Contrary to this argument, Blaylock never testified the Government's "got the video," *id.* at 59, though one might infer that by ignoring the direct testimony and focusing only on the cross-examination. So to clear up Defendant's assertion, the Government offered a rebuttal to which Defendants now object:

They also mention about these three days of video from Steve Blaylock and try to confuse you with that. We didn't jump up when he said it because you all heard what he said on the stand. He said, *Yeah, I had video, but I didn't give the police all that video*. It wasn't three days of video, ladies and gentlemen.

*Id.* at 74.

Some of this may be a matter of semantics, but the Government's rebuttal could likewise be read as failing to fully account for what Blaylock said. It was literally true that Blaylock did not testify that he gave the video to the police to keep as the defense argued, and his full testimony would not suggest that. So to that extent, the Government's rebuttal argument permissibly addressed defense counsel's overstatement. *Id.*[4] But the prosecutor also made the statement sound like a quote. And his next statement, denying three days of video, clouds the message and would be incorrect if construed to mean Blaylock did not offer access to the full video.

_____

[4] The fact that a defendant makes a false argument in closing does not open the door to impermissible rebuttal based on facts not in evidence. *See United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017) (refusing "to chalk up the prosecutor's outright defiance of the[ ] elementary principles of advocacy as permissible 'tit-for-tat'").

Assuming the Government's final statement regarding the three days of video was improper, Defendants' motion fails at the second step of the analysis—whether the comments affected their substantial rights. *Id.* As noted above, the analysis will first consider the magnitude of prejudice and whether corrective instructions were given. *Delgado*, 672 F.3d at 337.

Starting with the magnitude of the prejudice, the Fifth Circuit faced even more egregious statements in *United States v. Bennett* yet concluded: "[W]e cannot say the prosecutor's statements overshadowed what had come before in this nearly two-week trial in which the jury heard almost six full days of testimony from thirty-five different witnesses and received over 200 exhibits that were admitted into evidence." 874 F.3d at 255. The same is true here; the case lasted nearly two weeks with numerous witnesses and evidence, none of which were overshadowed by the disputed comments. In addition, while the Government may have overstated the quote it attributed to Blaylock, the take-away from it can be read as consistent with reasonable inference. Blaylock never said the Government actually acquired three days' worth of video and instead said they came to "rip" portions of it. Tr. [163] at 16.

The magnitude of the prejudice is further diminished because the parties were arguing collateral points. Whether the Government possessed the full video or merely had access to it misses the issue, as does the argument that there may have been three days' worth of video. What matters is whether the Government had access to the minutes before the robbery. In other words, did the Government see something that would impeach Slayton's testimony that Benamon drove past Blaylock's house around 4:30 p.m. that day? The Government's spin— even if inflated—did not speak to that issue; it never addressed what that portion of the video would show. So the statements regarding three days of video did not taint the defense counsel's

argument that the video would have been produced had it supported Slayton's timeline. *See* Tr. [167-1] at 59–61.

Turning to corrective instructions, *Bennett* is again helpful. There, the defendant apparently failed to object to statements involving facts that were not in evidence. Nevertheless, the Fifth Circuit noted that the trial

> court, at the start of trial, during opening statements, prior to closing arguments, and in the charge, issued generalized instructions that "what the attorneys say is not evidence." We presume that such instructions are followed unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.

*Id.* (internal citations and quotation marks omitted). Again, the same is true here. Defendants did not object, but the Court gave the jury that same pattern instruction on at least three occasions.

### 2.    Deborah Simon

Next, Defendants take issue with the prosecutor's apparent discounting of Deborah Simon's testimony. Deborah and Danny Simon gave conflicting testimony about when Mobley was seen passing their home on Son Mobley Road the evening of the robbery. The home is about a five-minute drive south from the crime scene, and Danny Simon testified that he saw Mobley between 5:30 p.m. and 6:00 p.m. That estimate would support the Government's timeline. But his wife, Deborah Simon, contradicted that testimony. Although she did not see Mobley herself, she was certain the car initially passed right about 5:15 p.m., which would conflict with the Government's timeline. Deborah Simon further explained that Danny Simon did not have a watch on when he saw Mobley pass.

Defense counsel commented on the discrepancy in his closing statement:

> What we know about Jamie Mobley that day is you heard from his neighbors, the Simons. You heard Mr. Simon get up and say, I'm out cutting the yard. I think it was between 5:30 and 6, and I don't know which it was between that. But I saw

him going down the road. He was in the passenger seat of the car. I'm down cutting the yard. I waved at him. He waved back. He goes down the road. All right. So that's where we left with that.

Then he also said this. He said, The man driving the car had dreadlocks on. I couldn't recognize him. I don't remember what the car was like. I have no memory of any of that. I just saw Jamie in there, waved at him. He was in the passenger seat. It goes down the road. It stays there for about 45 minutes, and then I see the car coming out and Jamie's not in it anymore. The man with dreadlocks driving the car is pulling out 45 minutes later.

So we don't have a time. He thinks 5:30 and 6. We then hear from his wife. Clear testimony. She's taking a nap. 3:00, lays down, sets her alarm at 5:15. She says, I'm not—I don't—the alarm doesn't go off. I'm king of laying there. I'm looking—I finally just turned it off. I got up about 5:15 and—I got up at 5:15. I'm walking out of my house. There's a big window there.

And she sees dust on the road, Son Mobley Road, and she goes out because she thought her husband who was cutting the yard had taken his mower out on that gravel dirt road, and she says something to him like what was that— were you out there on the road? You heard her testimony. But something—she mentioned—he says, No, that was Jamie coming home going home.

So at 5:15 Jamie Mobley is on Sun Mobley Road headed home, and he stays home and he stays back there, and the car that takes him in comes out about 45 minutes later.

Now there was also testimony as to Danny Simon not having a watch one [sic] on and why he didn't have a watch on because of his work. He couldn't wear one at work, and he came home and started cutting the yard. So we have that.

Tr. [167-1] at 50–52.

The prosecutor responded in rebuttal, describing the route Benamon supposedly took

after hitting Blaylock's dog on Porterville Road:

He's turned that left [off Porterville Road.] He goes on around. He goes to Sun [sic] Mobley Road where Mr. Danny Simon saw him. Mr. Simon, he saw what he saw.

And they want to confuse you with times here and times here, and even trying to dispute the AT&T records. The AT&T records show you what time— they tell you what time things happen. Ladies and gentlemen, these are lay witnesses. These are people who probably never wanted to or never wanted to be involved in this crime. They weren't sitting there looking saying, *Oh, it's 5:15*

*now.  I saw a car go by.  It's this time.*  They are giving their best estimate based on what they remember from that day as to what the times were.

They went down the road.  Mr. Simon told you he saw Mobley.

*Id.* at 72–73.

Defendants say the Government's argument improperly discounted Deborah Simon's credibility as to the time she says she saw dust on the road from a car going by.  They cite *United States v. Garza*, where the Fifth Circuit found a prosecutor's remarks in closing argument substantially prejudiced the defendant's right to a fair trial.  608 F.2d 659 (5th Cir. 1979).  But the remarks in *Garza* were much more direct; the prosecutor there described the motives of testifying federal agents as "pure as the driven snow" and said, "[I]f I thought that I had ever framed an innocent man and sent him to the penitentiary, I would quit."  608 F.2d at 662.  Counsel's indirect suggestion that Deborah Simon could have been mistaken about the time is not nearly as prejudicial as the remarks in *Garza*.

And even if the statements were sufficiently prejudicial to merit further consideration, the magnitude of any prejudice was diminished by the fact that the prosecutor did not directly challenge Deborah Simon by name; the trial was lengthy; and the Court had instructed the jury that arguments from counsel are not considered evidence.  *Bennett*, 874 F.3d at 255.

3.    Burden of Proof

Defendants finally say the Government improperly sought to shift the burden of proof to them.  Defense counsel suggested during its closing argument that a retired postal worker could have given Slayton the idea for the robbery.  The prosecution responded:

First of all, ladies and gentlemen, it's kind of hard to believe that the defense with absolutely no evidence before you all in the record have come in here today and one of the first things that they want to do is try to place the blame on a retired, 60-plus year old postal worker.

Tr. [167-1] at 64.

This statement drew no objection from defense counsel, but the Court immediately interjected: "I'm going to interrupt for just a second. And I'm just going to remind the jury that the defendants don't have the burden of producing any evidence in this case." *Id.* Before that, the Court had already thoroughly instructed the jury on the Government's burden of proof in its preliminary instructions and in the final instructions given just before closing arguments. The final instructions also stated that the defendant had no duty to "produce any evidence at all."

Although the Fifth Circuit "do[es] not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case," if the trial court "g[i]ve[s] an immediate curative instruction that . . . sufficiently erase[s] any doubts as to which party ha[s] the burden of proof," the prosecutor's statement in that regard "does not require reversal." *United States v. Iredia*, 866 F.2d 114, 118 (5th Cir. 1989). That occurred here.

        4.        Strength of the Evidence

As noted, some of the prosecutor's disputed rebuttal arguments are troubling if not improper. But as to each, Defendants fall short on the magnitude and curative-instruction elements. Likewise, the strength of the evidence—as detailed above—weighs against finding that those statements affected Defendants' substantial rights. "[T]he strength of the evidence supporting the conviction[s]" here was strong, making it "unlikely that the defendant was prejudiced by improper arguments of the prosecutor." *Delgado*, 672 F.3d at 337.

## IV.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Defendants' Motions for a New Trial [160, 162] are denied. The parties are directed to contact the undersigned's Courtroom Deputy, Shone Powell, to re-set the sentencing hearing.

**SO ORDERED AND ADJUDGED** this the 19th day of August, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE